Adam Lossechewich, Defendant in Error, *vs.* The Chicago City Railway Company, Plaintiff in Error.

*Opinion filed October 24, 1916.*

1. Negligence—*when street railway employee is negligent in not examining mechanism of a car before connecting trolley.* A street railway employee whose duty it is occasionally to run cars from the barns to other parts of the city and who has knowledge of the proper means of operating the car, is required, in exercising care for his own safety, to inspect the controller box or the canopy switch before placing the trolley on the wire, to determine whether or not the mechanism of the car is so adjusted as to turn the current on by merely putting on the trolley, and his failure to so examine the car before connecting the trolley is such contributory negligence as precludes a recovery in case of injury resulting therefrom.

2. Same—*when contributory negligence of street railway employee is not a question for the jury.* Where the evidence shows that the injury to a street railway employee was due to his failure to examine the controller box or canopy switch before putting the trolley on the wire and not because of any defective mechanism of the car or want of knowledge on his part as to the proper operation of the car, the question whether the injury was the result of his own negligence is not one of fact to be submitted to the jury.

3. Same—*when street railway employee cannot rely upon custom of other employees.* A street railway employee accustomed to the manipulation of the mechanism of cars and having knowledge that he should not connect the trolley without first examining the controller box and canopy switch cannot excuse his negligence in failing to do so by claiming reliance upon the custom of the other employees, when placing a car in position to be taken into service, to remove the controller and the reverse lever and turn off the canopy switch.

Writ of Error to the Second Branch Appellate Court for the First District;—heard in that court on appeal from the Superior Court of Cook county; the Hon. William E. Dever, Judge, presiding.

Franklin B. Hussey, and Charles LeRoy Brown, (John R. Guilliams, of counsel,) for plaintiff in error.

ELMER, COHEN & BELASCO, for defendant in error.

Mr. JUSTICE COOKE delivered the opinion of the court:

Defendant in error, Adam Lossechewich, recovered a judgment in the superior court of Cook county for $2500 against plaintiff in error, the Chicago City Railway Company, for personal injuries sustained while he was in the employ of plaintiff in error. This judgment was affirmed by the Appellate Court for the First District, and the record of that court is brought here for review by *certiorari.*

This case was tried twice. On the first trial the jury disagreed. On the second trial, at the close of defendant in error's evidence and again at the close of all the evidence, plaintiff in error asked the court to give a peremptory instruction to find it not guilty. Among the errors assigned and the grounds urged for reversal is the refusal of the court to give the peremptory instruction, it being contended in this connection that the injury complained of was the result of the contributory negligence of defendant in error.

Defendant in error was a laborer, and at the time of the accident had been working for more than three years in the car-barn of plaintiff in error located at the corner of Sixty-ninth street and Ashland boulevard, in the city of Chicago. This barn extended from Sixty-ninth street south to Seventieth street and was about a block in width. It was divided into seven bays by partitions extending north and south from Sixty-ninth street to Seventieth street. Each bay had three tracks extending its entire length, which were connected on both Sixty-ninth and Seventieth streets with the tracks leading into those streets. These bays were numbered from east to west, the east bay being No. 1. About halfway between Sixty-ninth and Seventieth streets there were long pits about four feet in depth under the various tracks extending through the barn. These pits were so constructed as to enable repairmen to get underneath the cars for the purpose of inspecting and repairing them. The

general method of operation consisted of driving the cars into the barn as they came from outside lines upon the Seventieth street line and running them one by one under their own power north into the bays, where they were left for inspection, cleaning and repair, if repairing was found to be necessary. As fast as the inspection, cleaning and repairing were completed the cars were moved north through the barn, where they were left to be taken out, as needed, to various points and placed in service again. The barn was in constant operation and night and day shifts of workmen were employed. It was lighted by overhead electric lights in each bay and there was also a light in front of each bay on the Sixty-ninth street side. Occasionally, in order to make room, the first car ready to be taken out would be left in the street in front of the barn. These cars were all operated by electricity, and the system used was an overhead wire which was connected with the car by a trolley. The evidence discloses that defendant in error was employed on the night shift, and during the three or three and one-half years he had been employed there he worked every night, including Sunday nights. He was employed as a car-cleaner, and his duties consisted chiefly in sweeping out and cleaning the cars as they were run through the barn and over the repair pits and out to Sixty-ninth street. While working there he learned to operate the cars, and after he had been employed for about two years he became so proficient in running the cars that he was frequently called upon, with the assistance of a helper or trolley-boy, to take the cars out on the lines of plaintiff in error to such points as they were needed for service. The principal part of this work was done by another man, but when a car was needed to be taken out in the absence of this man defendant in error was called upon to take it. He testified that he was in the habit of delivering cars to different points from the barn, under the orders of the foreman, once or twice a week. The testimony of other witnesses tends

to prove that he was in the habit of taking out cars much
oftener. He testified further that when he was ordered to
take out a car he was allowed to pick out any man he
chose as a helper or trolley-boy. On the night of April
26, 1911, the foreman directed defendant in error to select
a helper and take a car to Fifty-ninth street. Defendant in
error selected his helper and went to the second bay, from
which he had been directed to take the car. The car was
standing outside the barn, the rear end being three or four
feet north of the barn door. Immediately inside the barn,
with the front end about a foot from the door, stood an-
other car on the same track. There are two switches or
levers which control the operation of an electric car such
as the car in question: the controller handle and the re-
verse key or lever. Both of these are used on the controller
box, one controller box being on each end of the car. The
controller handle turns the current on and off and regu-
lates the amount. When it is turned off the power is dis-
connected and the car is "dead." The reverse key is used
to control the direction, the car going in the direction in
which the key is pointed. Both of these devices are detach-
able. In the handling of cars in the barn it was customary
when the cars were left in a position to be taken out on
the line, such as the car in question, to turn off the power
by means of the controller handle, turn the reverse key to
a neutral position, detach both the controller handle and the
reverse key and lay them on the controller box or else-
where about the car. The employee who was placing the
car would then remove the trolley pole from the wire and
fasten it down by tying the rope to a grab-handle at the side
of the rear end of the car. When left in that condition the
car could not be started by putting the trolley pole against
the wire and could not be moved until the controller handle
and reverse key were again attached and the power turned
on. In addition to these devices there was an overhead
switch in the ceiling of the canopy at each end of the car,

by means of which the current could be shut off from the
car even though the controller was turned on.   When de-
fendant in error and his helper approached the car which
he had been directed to take to Fifty-ninth street he directed
his helper to remove a sign which was on the car and he
untied the trolley rope from the grab-handle, stepped im-
mediately in the rear of the car and placed the trolley pole
upon the overhead wire.   As soon as the pole came in con-
tact with the wire the car started backward rapidly.   Plain-
tiff in error was caught between that car and the car just
inside the barn and his left leg was crushed above the knee.
As he fell he held to the trolley rope and pulled the trolley
pole from the wire, thus breaking the connection and shut-
ting off the current.   It was then discovered that neither
the controller handle nor the reverse key had been removed
from the controller box; that the power was turned fully
on and the reverse key set to move the car backward.   De-
fendant in error himself testified that it had been his cus-
tom when he had an order to take out a car to deliver to
some point on the line, to first go to the front end of the
car to see if the power was all right and then have his
trolley-boy put up the trolley on the wire for him; that on
this occasion he did not go to the front end of the car to
see whether the power was on or off; that he could have
told by looking at the controller box whether the power was
on or off and whether the car was set to go forward or
backward; that he knew there was a car standing on the
same track four or five feet behind this car, and that if
the power on this car was on and the reverse was set for
the car to move backward, the moment he put the trolley on
the wire the car would move backward; that it could not
have moved at all unless the power had been turned on,
and it would not have moved backward if the reverse had
not been set for that movement.

     There was proof made as to the safe and customary
method of placing a trolley on the wire and as to whether

the men were in the habit of inspecting the controller box on the front end of the car before placing the trolley on the wire when about to take a car out of the barn. In the view we take of the case it is immaterial whether the safe and customary method of placing a trolley on the wire was to stand on the rear of the platform of the car or to one side of the car, or whether with this particular style of car it was impossible to place the trolley upon the wire except by standing between the tracks at the rear of the car. Defendant in error had been employed in this barn for over three years. During that time he became familiar with the mechanism of electric cars and became sufficiently schooled in operating them that he was called upon to deliver them to the various points in the city of Chicago served from this car barn. He knew that if the controller was turned on and the reverse lever set to move the car backward, the moment the circuit was completed by placing the trolley on the overhead wire the car would move backward. He testified that it had been his custom theretofore, when called upon to take out a car, to go first to the front end and observe the condition of the controller box, and he stated that he had made a mistake this time by not doing so. It is not claimed that there was anything wrong with the mechanism of the car. It had passed through the barn, had been cleaned and inspected, and had been placed at the Sixty-ninth street entrance ready to be taken out on the line when called for. The car stood in the street where many people were constantly passing, and where some unauthorized person might, without being detected, replace the controller handle and the reverse key on the controller box if the same had been taken off by the employee who placed the car in that position. The lowest degree of ordinary care for his own safety would require defendant in error, with the knowledge he had of the mechanism of the car and its means of operation, before he placed the trolley on the wire to have inspected the controller box or the canopy

switch to determine whether or not the mechanism of the car was so adjusted as to turn the current on the moment the circuit was completed by connecting the trolley with the overhead wire.

Under the evidence, the question whether the injury to defendant in error was the result of his own negligence was not a question of fact to be submitted to the jury. The car, perfect in its equipment and with no defect in its mechanism, had been furnished by the plaintiff in error. With its mechanism properly adjusted the car would respond to and execute such movements as would be required of it. Defendant in error was familiar with this mechanism and knew how to operate the car. He knew that no further inspection of the car was had after it had passed over the pit in the bay, and it was his duty to so manipulate the mechanism of the car and operate it as not to cause injury to himself.

In *Drouillard v. Detroit United Railway Co.* 170 Mich. 444, Drouillard, a street car conductor, was directed to take a car from the car house. He went to the track upon which the car was standing, untied the rope of the trolley pole, stepped on the fender at the rear end of the car and adjusted the trolley to the wire. About five feet behind this car was another car. The instant the trolley touched the wire the car jumped back and injured Drouillard. He sued the company and upon the trial the court directed a verdict in favor of the defendant. The judgment of the trial court was affirmed by the Supreme Court of Michigan. The opinion states that the record disclosed that the switch on the front end of the car, which is operated for the purpose of controlling its movements, could be seen from the ground; that Drouillard made no effort to inform himself whether the overhead switch had been thrown off and the reverse lever put in the neutral position; that Drouillard knew if these things had not been done, the moment the trolley was put in place the car would do just what it did

do. While the rules of the street car company forbidding any employee to put a trolley on the wire while the controller was turned on were introduced in evidence and the court based its holding partly upon the fact that Drouillard had violated the instructions contained in the rules, we see no difference, in principle, between that case and this. In this case the defendant in error states that he could have told whether the controller was turned on if he had looked to see, but that he made no effort to inform himself of this fact.

It is insisted that defendant in error had a right to rely upon the custom of the men in taking the cars out of the barn and placing them in a position to be taken into service to remove the controller and the reverse lever and to turn the power off by means of the canopy switch, and on the rule of plaintiff in error requiring these things to be done whenever a car was left out of service. The rules of the street car company offered in evidence in the *Drouillard case, supra,* provided that after a ·car had been run to the car house the motorman must throw off the overhead switch, move the reverse lever to the off position and release the brake, yet Drouillard was not permitted to rely upon that rule to relieve him from the necessity of informing himself whether the car had been left in that position before attaching the trolley to the wire.

From the proof offered on behalf of defendant in error he was guilty of such contributory negligence as to preclude a recovery, and the peremptory instruction should have been given.

We deem it unnecessary to enter into an extended discussion of the questions raised on the pleadings. While the declaration might be held defective if tested by demurrer, it is sufficient to sustain a verdict upon proper and competent proof. The additional count does not state a new cause of action, and the demurrer to the plea of the Statute of Limitations was properly sustained.

For the failure to give the peremptory instruction the judgments of the superior and Appellate Courts are reversed and the cause is remanded to the superior court.

*Reversed and remanded.*